Jeremiah MAYNARD, Appellant,

v.

Laura M. SUTHERLAND, Appellee.

No. 16266.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 17, 1962.

Decided Nov. 1, 1962.

Curtis P. Mitchell, Washington, D. C., with whom James A. Washington, Washington, D. C., was on the brief, for appellant.

George H. Windsor, Washington, D. C., with whom George E. C. Hayes, Washington, D. C., was on the brief, for appellee.

Before WILBUR K. MILLER, DANAHER and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

District Judge Tamm, sitting without a jury, found that the appellee, Laura M. Sutherland, is the surviving joint tenant in fee simple under a deed recorded at Liber 7198, folio 11, of the land records of the District of Columbia; the appellant, her brother, was occupying the premises without right; Laura was entitled to possession and to recover $80 per month as reasonable rent of the premises from November 13, 1957 to the date Laura might gain possession. Judgment was entered accordingly.

The District Judge might have concluded that the action eventuated from a

brother-sister feud of more than twenty years' standing. The appellee, Laura M[aynard] Sutherland, and her mother, Rebecca Maynard, had been expressly described "as joint tenants" in a deed [1] from one Jane Eliza Scott, dated February 11, 1938. The premises conveyed are located at 1443 Que Street, N. W. in the District of Columbia and include a three story house containing some 13 rooms with two baths. Mother and daughter shared the house for many months, the mother renting rooms for which she received, as the appellant testified, varying sums, from $5 to $8 per room.

Some time in 1939, Laura and her brother had an argument. Blows were struck. Jeremiah testified that he "was summoned to court for assault for reasons I didn't know." While further specific details are lacking, it seems clear that the house ownership was involved, for Laura told her brother there was nothing he could do. He testified, "The house was in her name and her mother's. name. So that's when * * * they started a suit about it to find out why it was and what could be did about it." [2]

When that lawsuit was instituted in 1939, Laura left the house. The mother, as previously, continued to collect all of the income. Apparently she operated the house until September 13, 1957 when she died at the age of 83. Over the intervening years Jeremiah lived in the house, and at least from the date of the mother's death until some time after judgment was entered in the District Court, the house was also occupied by another brother and by Jeremiah's daughter and her four children. None of these members of the family paid rent. Jeremiah

---

1. This instrument created the respective rights of the grantees so that the surviving joint tenant might become sole owner of the property upon the death of the other. D.C.Code § 45–816 (1961) provides that every estate granted to two or more persons in their own right, including estates granted to husband and wife, shall be a joint tenancy when expressly so declared. And see Coleman v. Jackson, 109 U.S.App. D.C. 242, 244, 286 F.2d 98, 100 (1960),

cert. denied, 366 U.S. 933, 81 S.Ct. 1656, 6 L.Ed.2d 391 (1961); cf. Fairclaw v. Forrest, 76 U.S.App.D.C. 197, 130 F.2d 829, 143 A.L.R. 1154 (1942), cert. denied, 318 U.S. 756, 63 S.Ct. 531, 87 L.Ed. 1130 (1943).

2. Civil Action 3454, Maynard v. Sutherland, was thereupon commenced and will hereinafter be the subject of more particular discussion.

testified that after the mother's death he had not rented out rooms; "We stopped taking out a room license quite a while ago."

Shortly after Rebecca's death, the appellee served on her brother a notice to quit. Then, in a Municipal Court complaint describing her brother as a tenant at sufferance, she asked that court for a judgment for possession of the premises and for the rent in arrears.

Appellant filed a plea of title and an undertaking as the statute[3] provides, whereupon as of January 23, 1958, the action was transferred to the District Court for trial. Thereafter, the record shows various motions and pleas were interposed which at one time or other engaged the attention of at least seven different District Judges before the case came to trial in September 1960.[4]

■ The appellant relied in part upon an unprobated will purported to have been executed by his mother on October 14, 1953. The instrument recited a bequest to Laura of $100, with the residue in equal shares to the appellant and two brothers, one of whom has since died. Of course, if the District Court correctly concluded that Laura upon the death of her mother, had become the sole surviving joint tenant in fee simple under the original deed from Scott, the appellant could take no interest in these premises under the will.

Appellant next contended that Laura had "severed" the joint tenancy because on May 19, 1938 she had executed a deed of trust for the benefit of her mother. It is accordingly argued that there came into being between Laura and her mother only a tenancy in common.

Consideration of this aspect of the appellant's claim took the District Judge back to the Civil Action 3454, Maynard v. Sutherland, which went to judgment on July 2, 1941. Judge Jennings Bailey's order recited that the case had come on "to be heard upon the pleadings and proof taken in open court, and there having been a failure on the part of the plaintiff to support by competent testimony the allegations of the complaint," the "said cause" was dismissed.

Among the "pleadings" considered by Judge Bailey was the complaint reflecting the previously mentioned apparent desire of Jeremiah and other members of the family to see what could be done[5] about Laura's status. The mother alleged that Laura had been designated as a joint tenant in the Scott deed "without consideration," Rebecca had not known of that designation "until a long time thereafter" and a mistake had been made. She asked that the deed be reformed and that the property be conveyed to her free from "claims or interest of any kind or character whatever of the said Laura M. Sutherland and Jane Eliza Scott." The latter answered that Rebecca herself had instructed the District Title Company to draw the deed to Rebecca Maynard and Laura M. Sutherland as joint tenants, the District Title Company in its case No. 252057 had record evidence of the fact, and further that both Rebecca Maynard and Laura M. Sutherland had signed settlement book No. 292, p. 308, approving the title company statement which set forth the details of the transaction and showed the joint interests of mother and daughter.

Laura's answer in a "Third Defense" set up that the designation of her mother

---

3. See generally, Shapiro v. Christopher, 90 U.S.App.D.C. 114, 195 F.2d 785 (1952), and D.C.Code § 11–738 (1961). Pursuant thereto, National Surety Corporation filed its undertaking to pay damages, costs and reasonable intervening rent in a sum not to exceed $1,500.

4. At the outset of the trial, Judge Tamm announced that he was "familiar with the background of the case"; he had reviewed the pleadings and the proceedings in Civil Action 3454, Maynard v. Sutherland (infra). The file before him also contained a pretrial statement, signed by counsel for both parties, setting forth in extenso the facts upon which counsel agreed, and more particularly, their opposing contentions and their claims of fact and of law with respect thereto.

5. See note 2, supra, and accompanying text.

and herself as join tenants was made at the direction of the said Rebecca Maynard, "and upon the passing to her by previous transactions, made the basis thereof, and in consideration therefor, of full, adequate and legal consideration for the acquisition of the property in question as a joint tenancy." She further averred that the subject matter had been discussed, her mother was represented by counsel, the details had been explained, and the joint tenancy had been created at the mother's express direction "and because of the consideration which had been given by this defendant and which the plaintiff recognized and acknowledged."

Further in her answer Laura pleaded

"subsequent to the placing of the title in the plaintiff [Rebecca Maynard] and this defendant as joint tenants, when certain repairs and improvements became necessary to increase the income producing value of the property in question, 1443 Que Street, N. W., the plaintiff, advancing the money therefor, did require this defendant to give a note, secured on the property involved in this litigation, for the repayment of said amount, providing out of the income from the said property for the said repayment. This defendant sets forth that just as is now attempted by the Complaint filed herein to repudiate and avoid a legitimate business transaction between the plaintiff and this defendant, the

plaintiff did alter the plan and program agreed upon between these parties, violated the verbal contract had between them, and has taken over and assumed all of the control of the said property and the income therefrom, which she has been and is now receiving. This defendant sets forth further that the right of survivorship incident to the joint tenancy is the only benefit which she is receiving therefrom, in spite of and in violation of the consideration given by her therefor, and the attempt to deprive her of same is in the opinion of this defendant *not really the desire of the plaintiff*, who fully realizes the right of this defendant to same, *but is rather an inspired move of others who desire to themselves obtain the said property.*" (Italics added.)[6]

The record discloses no pleading responsive to Laura's "Third Defense." There was then no suggestion that Laura by the deed of trust executed on May 19, 1938 in favor of her mother had "severed" the joint tenancy created by the Scott deed, although Rebecca's suit was not reached for trial until nearly three years later. The action culminated, as previously noted, in a judgment dismissing the complaint.

■ District Judge Tamm in his "Memorandum Opinion" in the instant action seems to have evaluated that result as dispositive here. After reviewing the record in Civil Action 3454, he wrote "that the matter of title[7] is now

---

6. The "Pretrial Proceedings" in Civil Action 3454, approved by Judge Luhring on May 19, 1941, recited that by "agreement of counsel for the respective parties" the stipulations included:

"That the original settlement sheet covering this property in the possession of the title company may be received in evidence without formal proof; same stipulation as to photostatic copy of order for preparation of certificate of title, initialed by the court at pretrial for identification; payment book, initialed by the court for identification, in the name of Laura M. Sutherland, may be received in evidence

without formal proof, subject to reservation of right to object as to relevancy or materiality.

"That all receipts for work and labor done, and materials furnished in possession of defendant Sutherland, may be received in evidence without formal proof of signature of individual signing receipts, the plaintiff reserving right to object to relevancy or materiality of receipts."

7. Undoubtedly he meant, for his second conclusion of law so reads, that Judge Bailey's ruling was "conclusive of the joint tenancy" as between Rebecca and Laura, and those in privity with the par-

res judicata as to Rebecca Maynard" and those in privity with her. Judge Tamm expressed the view that Judge Bailey had ruled after consideration of the facts in the case "that as between Rebecca Maynard and Laura M. Sutherland a joint tenancy did in fact exist." He added "From the pleadings cited in some detail above, it is obvious that the existence of the deed of trust and the circumstances surrounding its execution were before Judge Bailey at the time of his decision." [8]

We turn to the instrument signed by Laura M. Sutherland on May 19, 1938. The deed of trust was never recorded. While it purports to recite the terms of a note running from Laura to her mother in the sum of $2,500, no note was ever found. The "note" called for payments at the rate of $25 per month in monthly installments to begin on June 19, 1938, with 6 per cent interest on the principal sum, but with each installment when paid "to be applied first, to the interest on the balance of the principal remaining unpaid and the balance thereof credited on the principal." [9]

The printed form next incorporates the premise that "the party of the first part desires to secure the prompt payment of said debt, and interest thereon, when and as the same shall become due and payable." [10] Thereafter the printed form recites that Laura is granting to "the parties of the second part" [11] the property in question.

Immediately following the description of the premises the scrivener caused to be specially typed into the document the following:

"(It is understood and agreed *between the maker of this trust and the party secured* that this trust shall encumber the interest of the party of the first part in said land and premises *in spite of the fact that the said parties are joint tenants in the ownership thereof*, and this Deed of Trust is given *for the purpose of becoming a lien upon the interest of the party of the first part in favor of the party secured*, her heirs, administrators, executors, or assigns the same as if the party of the first part were the sole owner of said real estate)" (Emphasis added.)

The printed form continues, defining as one of the "trusts," that Laura was to be permitted "to use and occupy the said * * * premises, and the rents, issues and profits thereof, to take, have, and

---

ties.  Cromwell v. County of Sac, 94 U. S. 351, 352, 24 L.Ed. 195 (1877).

8. The evidence taken before Judge Bailey is not available, and he made no findings. It fairly may be inferred that Laura then argued she became a joint tenant under the Scott deed and had so remained at the time of trial in 1941. We are unable to say that the "point or question actually litigated and determined in the original action," Cromwell v. County of Sac, supra note 7, 94 U.S. at 353, 24 L.Ed. 195, included consideration of the effect of the deed of trust of May 19, 1938 given by Laura to her mother. Her testimony at the earlier trial with respect to this point well may have been of great weight in Judge Bailey's determination that the Scott deed had created a *valid joint tenancy*. That last conclusion was certainly established by the judgment in Maynard v. Sutherland.

9. Mrs. Sutherland testified she had never signed a "note," indeed, when the deed of trust was signed, she had not as yet re-

ceived the money for the repairs. Attorney Wilson who had drawn the deed of trust, had no recollection as to the preparation of a note. Laura testified that "The purpose of the deed of trust was to give her a security after I had borrowed $2,500 which she knew I was going to make repairs on the house." The trial judge noted in his "Memorandum Opinion" Laura's "testimony that the note was paid, in full by the collection of all of the rents from the jointly held property by the mother."

10. Neither on June 19, 1938 nor at any other time during the 19 years of Rebecca's remaining life did she make demand upon Laura for any such payment.

11. J. Franklin Wilson, the scrivener, and Jeremiah Maynard are named as trustees. The latter testified he had no knowledge of that fact until the other "suit came up about the house." Neither trustee was ever called upon to make demand upon Laura or otherwise to act in execution of the terms of the trust indenture.

apply to and for her [12] or their sole use and benefit, until default be made in the payment of the said note hereby secured or any instalment of interest thereon, when and as the same shall become due and payable * * *."

The printed language provides additionally that "upon the full payment of all of said note" at any time before the sale herein provided for the trustees were "to release and reconvey" the premises to Laura.[13] Otherwise, the instrument reads, "upon any default or failure being made in the payment of said note or of any instalment of principal or interest thereon," [14] the trustees were empowered and it became their duty to sell the premises.[15] From the proceeds of such sale, after certain authorized expenses and deductions and after repayment of the holder of the note, the remainder was to be paid to Laura.[16]

The appellant in support of his plea of title, lodged his affidavit alleging that Laura not only was not the owner of the premises in question, but that she had no "bona fide legal interest" therein. Moreover, he continued, whatever interest she might assert had been obtained without consideration or not "by means of either a gift inter vivos or cause [sic] mortis." He alleged further that the premises "belonged legally, up to the time of her death, to Rebecca Maynard, the mother of the plaintiff, the defendant and of two brothers Joseph Maynard and Theodore Maynard." He relied also upon the mother's unprobated will.

Such was the setting in which the trial went forward. We have analyzed the record before us with detailed attention to the instrument upon which appellant relies. He would have us say that Laura's execution of the deed of trust, without more, destroyed the joint tenancy, so clearly established by the Scott deed and by the judgment in the first action, Civil Action 3454, supra. He so argues when the clear intendment of mother and daughter is overwhelmingly evidenced otherwise. He would, in effect, completely disregard a plumbing and heating contract signed by both mother and daughter on May 18, 1938, where both committed themselves to and later paid an obligation of $1,245.50 for the installation of bathrooms conforming to the D.C.Code, a heating plant and other equipment. He would eliminate from consideration the conduct and course of

---

12. Yet the undisputed evidence overwhelmingly shows that Laura never collected the rents from the rooming house and further that the mother did so.

13. D.C.Code § 45–603 (1961) specifically provides:

"The legal estate conveyed * * * to a trustee to secure a debt * * * shall be construed and held to be a qualified fee simple, determinable upon the release of the * * * deed of trust, as hereinafter provided * * *."

In Marshall v. Kraak, 23 App.D.C. 129, 132 (1904), analyzing the effect of this section, this court said that the Code proceeds upon the assumption that a deed of trust by way of mortgage "is in fact not so much a conveyance or transfer of the property mortgaged as a lien upon it; and while the Code recognizes that a legal estate is conveyed by such mortgage or deed of trust to the trustee, yet it is designated as a qualified determinable fee [§ 603] and the barrenness of such an estate is everywhere emphasized. * * *

Courts of equity have from time immemorial recognized that the estate of the trustee is a naked legal title without any beneficial interest whatever * * * and they have always held the legal title in strict subordination to the beneficial interest of the debtor and creditor in the transaction."

14. It is settled law that where the instrument so provides such a default of payment of the first installment gives rise to a right in the holder to demand a sale in accordance with the stipulations. Wheeler v. McBlair, 5 App.D.C. 375, 381 (1895), aff'd, 172 U.S. 643, 19 S.Ct. 882, 43 L.Ed. 1182 (1898).

15. Of course, "The terms of the instrument measure the powers and prescribe the duties of the trustees." Anderson v. White, 2 App.D.C. 408, 419 (1894).

16. The trustees in a deed of trust to secure a loan occupy a fiduciary relationship to the debtor as well as the creditor. Holman v. Ryon, 61 App.D.C. 10, 13, 56 F.2d 307, 310 (1932).

action pursued jointly by mother and daughter, both while they shared the house and for nineteen years thereafter. Thus, he says, an unrecorded deed of trust found in the mother's trunk after her death, must be made effective to negate the clear and overwhelmingly established intention of mother and daughter, even as the incongruities so apparent on the face of the instrument belie the result for which he contends.

Appellant has failed to convince us that the mother in her dealings with Laura was permitting the latter to destroy the mother's right to survivorship in the event of Laura's prior death. He offers no explanation of why the mother would wish to become a tenant in common when otherwise she was fully protected. In short, in the circumstances shown, if it can be said that the "trustees" here took any interest in the premises, they did so as trustees for both mother and daughter and to carry out their plan.[17] Bound to look to the instrument for its terms, the trustees, had they been called upon to act, would have found that mother and daughter "in spite of the fact that the said parties are joint tenants in the ownership thereof," had specifically agreed only that Laura's life interest in the property was to be subject to a lien in favor of the mother.

■■ We are persuaded rather that Rebecca and Laura entered into an agreement which was exactly as Laura described it. The mother made available $2,500 to be expended upon extensive repairs to the house. Clearly, she wished to be secured until she could recoup the monies so advanced. If she obtained reimbursement from the rental income before Laura should die, the $2,500 would be part of her separate estate. In any event, whether the mother recover her $2,500 or not, if Laura should predecease Rebecca, the latter would take title to the whole, in fee simple. Such an agreement was within the competence of mother and daughter. As joint tenants, they were free to contract with each other for the use of the common property and even to provide for the exclusive use of the property by one of them.[18]

■■ We are not dealing with an instrument running to strangers nor with the interests of creditors or bona fide purchasers. The state of the record title remained and still remains as it was in 1938. The scrivener here gave recognition to the principle, long since established, that the grantor in a deed of trust continues as the real owner of the property, conveyed in fee. Here as the typed language shows, even when identifying the parties as joint tenants, he actually treated Laura as the grantor only of her own share, although in text, she purported to grant title to the whole, which she did not own.[19] In short, notwithstanding the conveyance by deed of trust, "The equity of redemption is considered to be the real and beneficial estate; and it is accordingly held to be descendible by inheritance, devisable by will, and alienable by deed, precisely as if it were an absolute estate of inheritance at law."[20] The deed of trust is a mere security for debt upon the payment of which the deed of trust becomes "extinct."[21]

Had Laura conveyed to a stranger, we would have had a very different question, but one which we need not here consider.[22] Appellant urges upon us as controlling various cases, a few of which may be noticed, to illustrate his claim that the ancient doctrine of the four

---

17. W. A. H. Church, Inc. v. Holmes, 60 App.D.C. 27, 29, 46 F.2d 608, 610 (1931).

18. Tindall v. Yeats, 392 Ill. 502, 64 N.E.2d 903, 906, 907 (1946). Cf. Hardin v. Wolf, 318 Ill. 48, 148 N.E. 868, 872, 873 (1925).

19. Of course she had no authority to sell or bind the interest of her mother. Lipscomb v. Watrous, 3 App.D.C. 1, 5 (1894).

20. Wood v. Grayson, 22 App.D.C. 432, 445, 446 (1903), appeal dismissed, 200 U.S. 257, 26 S.Ct. 240, 50 L.Ed. 470 (1906).

21. Id.; and see W. A. H. Church, Inc. v. Holmes, supra note 17; D.C.Code § 45–603 (1961), supra note 13.

22. But see, Swenson & Degnan, Severance of Joint Tenancies, 38 Minn.L.Rev. 466,.

unities precludes any result other than that the joint tenancy was destroyed by the execution of the deed of trust.

Turning first to Eder v. Rothamel,[23] we notice certain generalizations which seem to support appellant's contention. But the actual holding was that Eder, a judgment creditor of Rothamel, a joint tenant, lost his lien upon the latter's interest in certain real estate when Rothamel died. The court explained:

> "The general rule that a judgment lien will not sever the tenancy is consistent with the common-law theory that the mere creation of a lien or charge upon joint property would not diminish or affect any unity or a joint tenancy. See 2 Tiffany, Real Property, 3rd Ed. Sec. 425, page 210–211."[24]

Appellant cites the Maryland case of Wolf v. Johnson[25] which held only that the interest in real estate of a deceased joint tenant must answer for the payment of a sum for which he had executed a deed of trust as a pledge to a third party.

Appellant also points to Hammond v. McArthur.[26] There, as the opinion was developing, the court observed that a voluntary conveyance to a *stranger* of the entire interest of a joint tenant severs the joint tenancy relationship. It recited Miss McArthur's contention that her transfer of a life estate to her co-tenant, a great-aunt, had conveyed to the latter only that which she already possessed, an estate which was not repugnant to the rights of survivorship. Sim-

ilarly, the author noted that joint tenants may contract with each other concerning exclusive possession and division of income from the property without necessarily terminating the joint tenancy. He added that when one of two joint tenants in fee simple conveys his interest for life, upon the termination of the life interest, the original joint tenancy is revived. Apart from such general principles, the court actually held that Miss McArthur's transfer to her co-tenant of a life estate in property held in joint tenancy did not destroy the joint tenancy for the purposes of survivorship.

The appellant additionally cites Lawler v. Byrne,[27] but there a mother by warranty deed conveyed to her children her entire interest in property, title to which had been vested in her and her second husband as joint tenants. The case did not involve a mortgage or deed of trust given to secure a debt, nor was the transaction between co-tenants. The holding does not reach our problem.

The cases cited by the appellant do not support his contention. And so the case comes back[28] to what mother and daughter sought to accomplish as disclosed by the exhibits and the evidence as hereinbefore analyzed. After the lapse of some nineteen years[29] and under all the facts and circumstances shown in this record, we hold that Laura M. Sutherland's right of survivorship was not destroyed, as claimed. It follows that the judgment of the District Court is

Affirmed.

488–492 (1954) ; Sturges & Clark, Legal Theory and Real Property Mortgages, 37 Yale L.J. 691 (1928) ; Wilken v. Young, 144 Ind. 1, 41 N.E. 68, 590 (1895).

23. 202 Md. 189, 95 A.2d 860 (1953).

24. Id. at 195, 95 A.2d at 863.

25. 157 Md. 112, 121, 145 A. 363, 367 (1929). Nowhere did the opinion mention the four unities although the court in Eder v. Rothamel, supra note 23, seems to have read the Wolf result as predicated thereon. In Eder, similar notice was taken of

MacPherson v. Snowden, 19 Md. 197, 230 (1862), the holding of which, as we read it, has no bearing on our problem.

26. 30 Cal.2d 512, 183 P.2d 1 (1947) ; cf. People v. Nogarr, 164 Cal.App.2d 591, 330 P.2d 858, 67 A.L.R.2d 992 (1958).

27. 252 Ill. 194, 96 N.E. 892 (1911).

28. Cf. Smithsonian Institution v. Meech, 169 U.S. 398, 411, 18 S.Ct. 396, 42 L.Ed. 793 (1898).

29. Cf. Talbott v. Hill, 49 App.D.C. 96, 261 F. 244 (1919).